# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

DRAGADOS USA, INC.,

                Plaintiff,

v.                                  CIVIL ACTION NO.   1:23-cv-787

LIBERTY INSURANCE CORP.; and DOES
1 through 10, inclusive,

                Defendants.


## MEMORANDUM OPINION AND ORDER


The Court has reviewed *Defendant Liberty Insurance Corp.'s Motion for Summary Judgment and Request for Oral Argument* (Document 37), *Defendant Liberty Insurance Corp.'s Memorandum in Support of Its Motion for Summary Judgment* (Document 43), the Plaintiff's *Memorandum of Law in Opposition to Defendant Liberty Insurance Corp.'s Motion for Summary Judgment* (Document 49), and *Defendant Liberty Insurance Corp.'s Reply Memorandum of Law in Support of Its Motion for Summary Judgment* (Document 54), as well as all attached exhibits.

In addition, the Court has reviewed *Plaintiff Dragados USA, Inc.'s Motion for Summary Judgment* (Document 38), the *Memorandum of Law in Support of Dragados USA, Inc.'s Motion for Summary Judgment* (Document 39), *Defendant Liberty Insurance Corp.'s Memorandum of Law in Opposition to Plaintiff Dragados USA, Inc.'s Motion for Summary Judgment* (Document 48), and *Plaintiff Dragados USA Inc.'s Reply to Defendant's Opposition to Plaintiff's Motion for Summary Judgment* (Document 55), as well as all attached exhibits.   For the reasons stated herein, the Court finds that Liberty's motion should be granted and Dragados' motion should be denied.

# FACTS[1]

The Plaintiff, Dragados USA, Inc., a Delaware corporation with its principal place of business in New York, brought this suit against Liberty Insurance Corporation, an Illinois corporation with its principal place of business in Massachusetts. Dragados obtained a Commercial General Liability Insurance Policy (the Policy) from Liberty, bearing policy number TB7-611-B6N3Q4-038. (Policy, Def.'s Ex. A) (Document 37-2.) The Policy provided coverage for the period from June 1, 2018 to June 1, 2019. The Issuing Office was Roseland, NJ, and the mailing address listed for Dragados was in New York. This case centers on whether the Policy requires Liberty to provide a defense and coverage related to a now settled lawsuit (the Parmer suit) alleging that Dragados improperly placed large amounts of fill on a property near a project site.

Dragados won a bid for a highway construction project with the North Carolina Department of Transportation (NCDOT). Dragados paid to use an undeveloped nearby property owned by Durham Coca-Cola (Durham Coke) to excavate and obtain dirt and fill material in 2016 and 2017. The property consists of 16 parcels with a combined total of approximately 170 acres. In 2018, Dragados and Durham Coke agreed that Dragados could return fill to the property. In an email exchange dated September 18, 2018, a Dragados engineer provided options for placing fill at the property: "Option 1 shows placing about 35k in the top left quadrant near the farmhouse and option 2 shows placing about 80k in the bottom left quadrant." (Def.'s Ex. F) (Document 37-8.) The response from Durham Coke stated, "Yes we prefer Option 1." (*Id.*) Dragados also submitted

---

[1] Because both parties have filed motions for summary judgment, where facts are disputed, the Court will note the evidence submitted by each party to allow consideration of the evidence in the light most favorable to the non-moving party as to each motion.

2

reclamation plans to NCDOT that specified placement of 38,300 cubic yards of fill on the Durham Coke property. (12/19/2018 Rec. Plan, Pl.'s Ex. 5) (Document 39-6.) In an email exchange on or about June 4, 2019, a Dragados representative informed a Durham Coke representative that they had placed approximately 30,000 cubic yards of material and estimated that they would "haul in another 50,000 CY before we are done." (6/4/2019 email, Pl.'s Ex. 19) (Document 39-20.) The Durham Coke representative replied without posing any objection to the quantity of material exceeding the previously agreed upon amount.

Durham Coke sent Dragados a cease-and-desist letter dated September 3, 2021, directing that "Dragados and its employees, contractors, and agents must immediately CEASE AND DESIST from any further dumping of materials of any sort on our property." (Coke Cease and Desist, Pl.'s Ex. 15) (Document 39-16.) The letter indicates that Durham Coke had learned that Dragados had dumped "construction materials, old tires, wood and possibly contaminated or unsuitable dirt/soils, and other unauthorized materials," in violation of the Borrow Pit Agreement and possibly environmental and other laws. (*Id.*) Dragados stopped placing fill on the property.

Durham Coke subsequently sold the property to Parmer Edge, LLC, a property development company. Parmer Edge filed suit on March 30, 2022, with claims of trespass, breach of contract, permanent injunction for removal of trespass, and punitive damages. Parmer alleged that Dragados dumped 800,000 to 850,000 cubic yards of soil, rock and construction debris. An expert report commissioned by Dragados during the Parmer suit estimated that Dragados placed a total of approximately 335,000 cubic yards of fill at the property. (MRCE Rep. at 1, Def.'s Ex. Z) (Document 37-28.)

3

The Parmer suit alleged that Dragados dumped multiple truckloads of material daily between April 2019 and September 2021, including both unauthorized construction debris and soil and rock far in excess of the amount permitted by agreement with Durham Coke.   (Parmer Compl. at ¶¶ 29-30, Pl.'s Ex. 1) (Document 39-2.)   Parmer alleged that the quantity of extra material would have required tens of thousands of truckloads to transport, and "only could have been done with malicious, intentional or reckless disregard for Parmer's rights."   (*Id.* at ¶ 41.)   Parmer asserted that the excess material must be removed prior to development, and it was damaged both by the costs associated with removing the excess material and by the associated delay in development.   Parmer contended that Dragados trespassed onto the property by dumping material without authorization and that its trespass continued as long as the unauthorized material remained present on the property.   Parmer further alleged that Dragados breached the various agreements with Durham Coke, by dumping "a quality or type of material" that was not authorized, and by dumping material in excess of the authorized quantities.   (*Id.* at ¶ 51.)   Parmer sought "a permanent injunction requiring Dragados to remove all unauthorized material dumped on the Property, to repair the Property to its prior condition, and to bear all costs and expenses of doing so."   (*Id.* at ¶ 58.)   Finally, Parmer sought punitive damages.

Dragados emailed Liberty regarding the suit to seek coverage for the defense on or about March 10, 2022,[2] and an adjuster for Liberty responded with questions regarding the background facts surrounding the suit and Dragados' dumping of materials on the property.   (Pl.'s Ex. 6-7) (Document 39-7 and 39-8.)   Liberty also indicated that it had referred the case to the office of the attorney requested by Dragados.   (*Id.*)   Liberty's claim notes reflect its understanding that

---

2  Parmer filed a previous version of the lawsuit with similar allegations prior to the complaint dated March 30, 2022. The prior suit was dismissed.

Dragados engaged in negotiations with Parmer to remediate by removing the excess fill and resolve the suit. In a letter dated February 28, 2023, Liberty denied coverage for the lawsuit and indicated that it would no longer participate in the defense. (Liberty Denial Letter, Pl.'s Ex. 8) (Document 39-9.) Liberty explained that the Parmer complaint "alleges Dragados intentionally dumped 'waste and material' back on the property between April 1, 2019 and September 3, 2021. Plaintiff alleges that Dragados dumped 20 times more than the contracted 38,000 cubic yards and that the material included debris and other alleged unauthorized materials on the property which have made the property unsuitable for development without extensive remediation." (Liberty Denial Letter at 1.) Liberty based its denial on the grounds that "the Lawsuit alleges only the purposeful and intentional actions of the Insured in dumping debris and material on the property," rather than an "accident" as required to constitute an "occurrence" under the Policy, further reasoning that a policy exclusion barring coverage for "damage that is expected or intended from the standpoint of the insured" would apply to the alleged trespass and dumping of "a vast amount of material and debris." (*Id.* at 3-4.) Dragados and Liberty had continuing communications after the denial letter wherein Dragados put forth additional information and argument regarding coverage, but Liberty maintained its position that coverage was not available.

Dragados and Parmer ultimately entered into a confidential settlement agreement. (Settlement Agreement, Pl's Ex. 2) (Document 41-3) (sealed.) The settlement agreement requires Dragados to remove the excess material in accordance with specified terms and conditions. Dragados subsequently initiated this action by filing *Dragados USA, Inc.'s Complaint Against Liberty Insurance Corp. for Declaratory Relief* (Document 1) on September 12, 2023. Dragados seeks a declaratory judgment finding that Liberty "has a duty to defend and indemnify Dragados

5

from the Parmer Suit under the policy," in addition to alleging breach of contract. (Compl. at ¶ 56.) Both parties have moved for summary judgment, and the motions are fully briefed.

## STANDARD OF REVIEW

The well-established standard in consideration of a motion for summary judgment is that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a)–(c); *see also Hunt v. Cromartie*, 526 U.S. 541, 549 (1999); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986); *Hoschar v. Appalachian Power Co.*, 739 F.3d 163, 169 (4th Cir. 2014). A "material fact" is a fact that could affect the outcome of the case. *Anderson*, 477 U.S. at 248; *News & Observer Publ'g Co. v. Raleigh-Durham Airport Auth.*, 597 F.3d 570, 576 (4th Cir. 2010). A "genuine issue" concerning a material fact exists when the evidence is sufficient to allow a reasonable jury to return a verdict in the nonmoving party's favor. *FDIC v. Cashion*, 720 F.3d 169, 180 (4th Cir. 2013); *News & Observer*, 597 F.3d at 576.

The moving party bears the burden of showing that there is no genuine issue of material fact, and that it is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Celotex Corp.*, 477 U.S. at 322–23. When determining whether summary judgment is appropriate, a court must view all of the factual evidence, and any reasonable inferences to be drawn therefrom, in the light most favorable to the nonmoving party. *Hoschar*, 739 F.3d at 169. However, the non-moving party must offer some "concrete evidence from which a reasonable juror could return a verdict in his favor." *Anderson*, 477 U.S. at 256. "At the summary judgment stage, the non-moving party must come forward with more than 'mere speculation or the building of one inference upon

6

another' to resist dismissal of the action." *Perry v. Kappos*, No.11-1476, 2012 WL 2130908, at *3 (4th Cir. June 13, 2012) (unpublished decision) (quoting *Beale v. Hardy*, 769 F.2d 213, 214 (4th Cir. 1985)).

In considering a motion for summary judgment, the court will not "weigh the evidence and determine the truth of the matter," *Anderson*, 477 U.S. at 249, nor will it make determinations of credibility. *N. Am. Precast, Inc. v. Gen. Cas. Co. of Wis.*, 2008 WL 906334, *3 (S.D. W. Va. Mar. 31, 2008) (Copenhaver, J.) (citing *Sosebee v. Murphy,* 797 F.2d 179, 182 (4th Cir. 1986). If disputes over a material fact exist that "can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party," summary judgment is inappropriate. *Anderson*, 477 U.S. at 250. If, however, the nonmoving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case," then summary judgment should be granted because "a complete failure of proof concerning an essential element . . . necessarily renders all other facts immaterial." *Celotex*, 477 U.S. at 322–23.

When presented with motions for summary judgment from both parties, courts apply the same standard of review. *Tastee Treats, Inc. v. U.S. Fid. & Guar. Co.*, 2008 WL 2836701 (S.D. W. Va. July 21, 2008) (Johnston, J.) *aff'd,* 474 F. App'x 101 (4th Cir. 2012). Courts "must review each motion separately on its own merits to determine whether either of the parties deserves judgment as a matter of law," resolving factual disputes and drawing inferences for the non-moving party as to each motion. *Rossignol v. Voorhaar*, 316 F.3d 516, 523 (4th Cir. 2003) (internal quotation marks and citations omitted); *see also Monumental Paving & Excavating, Inc. v. Pennsylvania Manufacturers' Ass'n Ins. Co.*, 176 F.3d 794, 797 (4th Cir. 1999).

## CHOICE OF LAW

The first issue that must be resolved is whether this dispute is governed by North Carolina law or New York law. Dragados contends that North Carolina law applies based on a North Carolina statute providing that insurance contracts on "property, lives, or interests" in North Carolina are subject to North Carolina law. (Dragados Mem. at 10) (Document 39.) It argues that there is a sufficiently close connection between the interests at issue and the state of North Carolina to apply North Carolina law, noting that the project Dragados was contracted to complete involved "activities integral to the construction of a North Carolina freeway system commissioned by NCDOT." (*Id.* at 11.) Liberty, meanwhile, contends that New York law applies because the insurance policy was delivered to Dragados' corporate headquarters in New York, Dragados issued premiums from New York, the Policy is endorsed with New York forms, and neither party has close connections to North Carolina.

"A federal court exercising diversity jurisdiction must apply the choice of law rules of the state in which it sits." *Perini/Tompkins Joint Venture v. Ace Am. Ins. Co.*, 738 F.3d 95, 100 (4th Cir. 2013). In North Carolina, "the substantive law of the state where the last act to make a binding contract occurred, usually delivery of the policy, controls the interpretation of the contract." *Fortune Ins. Co. v. Owens*, 526 S.E.2d 463, 466 (N.C. 2000). However, a North Carolina statute providing that "[a]ll contracts of insurance on property, lives, or interests in this State shall be deemed to be made therein…" establishes an exception to the general rule. N.C. Gen. Stat. § 58-3-1. North Carolina courts have construed § 58-3-1 to require application of North Carolina law "where a close connection exists between [North Carolina] and the interests insured by an insurance policy." *Fortune*, 526 S.E.2d at 466.

8

In *Fortune*, the Supreme Court of North Carolina found North Carolina's connection insufficient where an auto accident occurred in North Carolina, but the parties to the insurance contract were Florida residents who entered into the contract in Florida. *Id.* Where a policy covered a fleet of vehicles, most of which were titled in North Carolina, and the plaintiff company's transportation division was located in North Carolina, the Supreme Court of North Carolina found application of North Carolina law warranted based on the state's close connection with the substance of the policy. *Collins & Aikman Corp. v. Hartford Acc. & Indem. Co.*, 436 S.E.2d 243, 245-46 (N.C. 1993).

The facts presented herein fall somewhere in between the cases in which North Carolina courts found a close connection and applied North Carolina law and those in which it found that the law of the state where the contract was delivered should apply. The North Carolina project involved a $142 million highway construction contract with the state. However, the policy provided coverage for Dragados and dozens of subsidiary and related companies with business interests elsewhere. Dragados is a large corporation headquartered in New York, and the policy was delivered in New York. The Liberty policy was issued after the North Carolina highway project began.

The Fourth Circuit has instructed courts to complete a choice of law analysis only when the differences in the laws of the states at issue would lead to a different outcome in the case. *Perini/Tompkins Joint Venture v. Ace Am. Ins. Co.*, 738 F.3d 95, 101 (4th Cir. 2013). Where the choice of law would not impact the outcome, the law of the forum state governs. *Id.* Here, because the Court finds that Liberty prevails even under North Carolina law[3] as outlined *infra*,

_____

3 The Court has not included a discussion of New York law herein, but there is no dispute between the parties that New York law, to the minimal extent that it differs from North Carolina law on the relevant issues of how to define

9

there is no need to resolve the close question of whether there is a sufficient connection between the Policy and North Carolina to warrant application of North Carolina law despite contract formation taking place in New York.

## DISCUSSION

Dragados argues that it is entitled to summary judgment because the underlying Parmer suit alleged an "occurrence" and "property damage" within the meaning of those terms in the Policy, and a breach of the duty to defend requires indemnification of the reasonable settlement Dragados entered into to resolve the Parmer suit. It cites precedent establishing that even a possibility that any claim in a lawsuit against an insured entity is covered triggers an insurer's duty to defend the entire action. It emphasizes that Liberty undertook the defense with no reservation of rights after being notified of the suit, and did not withdraw its defense until fourteen months later. Dragados contends that, although the placement of fill on the Coke property was intentional, the resulting harm was not—it understood that Coke intended to leave the property undeveloped and could not have anticipated that the fill would interfere with the development plans of a future owner. "Here, the 'accident' refers to Dragados's alleged placement of fill material onto the Property in excess of a purported limit to its authorization, and Dragados's lack of specific intent to cause the particular harm alleged by Parmer, ***not*** whether Dragados's placement of fill material was done intentionally." (Dragados Mem. at 13) (emphasis in original.) Dragados further argues that the scope of authorization to place fill on the Coke property was ambiguous. In addition, Dragados contends that the Parmer suit alleged that Dragados physically injured the Property, which constitutes property damage as defined in the Policy.

---

an "accident" in the context of insurance coverage and when an insurer must provide a defense for an insured, is more favorable to Liberty.

Liberty argues that it is entitled to summary judgment because the Parmer suit contains allegations of intentional, not accidental conduct, which does not constitute an "occurrence" under the Policy terms. Liberty emphasizes that the quantity of fill Dragados dumped on the property, as alleged in the Parmer suit, vastly exceeded the agreed upon amount. It contends that the Parmer action describes intentional conduct—the dumping of twenty times the authorized quantity of fill—with foreseeable results. It characterizes the Parmer suit as primarily a contractual dispute, and asserts that it disclaimed coverage only after discussions of the case revealed (a) that the agreement was for 38,000 cubic yards of fill and (b) that Dragados estimated it had placed 200,000 to 300,000 cub yards of excess fill. It argues that intentional dumping, even if Dragados did not knowingly exceed the scope of its authority to place fill on the Property, is not accidental and therefore is not an occurrence triggering coverage, although it also contends that the volume of fill involved establishes that Dragados knew it exceeded its authorization. Liberty further argues that the Parmer suit does not allege "property damage" within the meaning of the Policy because "the Site can be used and developed once the excess dirt is removed." (Liberty Mem. at 21.) Finally, Liberty contends that a Policy exclusion for expected or intended injuries is applicable because the injury here was expected or intended by Dragados when it dumped the excess fill.

The Policy provides coverage for bodily injury or property damage that "is caused by an 'occurrence' that takes place in the 'coverage area.'" (Policy, Section I) (Document 37-2 at 22.) An exclusion provides that the insurance does not cover property damage "expected or intended from the standpoint of the insured." (*Id*. at 23.) An "occurrence" is defined as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions." (*Id*. at 36.) "Property damage" is defined as "physical injury to tangible property, including all

11

resulting loss of use of that property…[and] loss of use of tangible property that is not physically injured." (*Id.*)

"An insurer's duty to defend its insured is broader than its duty to pay damages incurred by events covered by the policy." *Smith v. Nationwide Mut. Fire Ins. Co.*, 446 S.E.2d 877, 878 (N.C. 1994). The determination of whether an insurer owes a duty to defend is made based on whether coverage is available for the facts as alleged in the underlying complaint. *Id.* Even where a complaint does not appear to allege facts within the scope of coverage, "[w]here the insurer knows or could reasonably ascertain facts that, if proven, would be covered by its policy" it has a duty to defend. *Waste Mgmt. of Carolinas, Inc. v. Peerless Ins. Co.*, 340 S.E.2d 374, 377 (N.C. 1986). "Those provisions in an insurance policy which extend coverage to the insured must be construed liberally so as to afford coverage whenever possible by reasonable construction. However, the converse is true when interpreting the exclusionary provisions of a policy." *N. Carolina Farm Bureau Mut. Ins. Co. v. Stox*, 412 S.E.2d 318, 321 (N.C. 1992) (internal citation omitted).

"Accident" is not defined in the policy. The Supreme Court of North Carolina has held that "where the term 'accident' is not specifically defined in an insurance policy, the term *does* include injury resulting from an intentional act, if the injury is not intentional or substantially certain to be the result of the intentional act." *Id.* at 325 (emphasis in original). The Fourth Circuit, applying North Carolina law, has found that an "accident," when the term is undefined in an insurance policy, is "an unforeseen event, occurring without the will or design of the person whose mere act causes it; an unexpected, unusual, or undesigned occurrence; the effect of an unknown cause, or, the cause being known, an unprecedented consequence of it; a casualty." *ABT Bldg. Prods. Corp. v. Nat'l Union Fire Ins. Co. of Pittsburgh*, 472 F.3d 99, 120 (4th Cir. 2006)

12

(quoting *Waste Mgmt. of Carolinas, Inc. v. Peerless Ins. Co.,* 315 N.C. 688, 340 S.E.2d 374, 379 (1986)). In addition, an accident can include acts of negligence "when the resulting damage takes place without the insured's actual foresight or expectation." *Id.* at 120-21. "[T]he issue is not whether an insured should have foreseen the consequences of its conduct, but whether it in fact foresaw or intended the resulting damages." *Id.* at 121. "A common element in the Supreme Court's definition of 'accident' is the notion that an accident is 'unforeseen,' 'unexpected,' 'unusual,' 'undesigned,' the effect of an 'unknown cause,' or an 'unprecedented consequence." *Wm. C. Vick Const. Co. v. Pennsylvania Nat. Mut. Cas. Ins. Co.*, 52 F. Supp. 2d 569, 584 (E.D.N.C. 1999), *aff'd sub nom. Wm. C. Vick Const. Co. v. Great Am. Ins. Co.*, 213 F.3d 634 (4th Cir. 2000).

In *Waste Management*, the Supreme Court of North Carolina outlined the specific factual scenarios that had been found to be, or not to be, accidental in nature for insurance purposes. *Waste Mgmt. of Carolinas, Inc. v. Peerless Ins. Co.*, 340 S.E.2d 374, 380 (N.C. 1986). Removing shrubs and trees on the mistaken belief that they were on the insured's property was an "occurrence." *Id.* at 379. Whether a building inspector's allegedly wrongful demolition of building exceeded his authority was determinative as to whether it was an "occurrence:" the city, as the insured, "could not reasonably have…anticipated" the breach of duty when an inspector allegedly acted outside the scope of his authority, but when the building inspector acted "in performance of his governmental duties," it was not accidental and therefore not an occurrence. *Id.* at 380. In *Waste Management*, the insured dumped contaminated materials in a landfill, which eventually leached and contaminated the groundwater. The court concluded that the leaching was "arguably unexpected and unintended," and therefore an occurrence, though the policy included a pollution exclusion that applied such that there was no coverage. *Id.* at 382-83.

13

The Parmer suit alleged that Dragados dumped fill onto the Coke property, in quantities vastly exceeding the amount authorized by contract. It also alleged that Dragados dumped construction waste material in addition to the fill that it was authorized to place in limited quantities. Dragados has produced no evidence that it had authorization, or believed it had authorization, to dump more than, at most, 80,000 cubic yards of fill. There is nothing in the record to suggest an open-ended authorization for unlimited dumping. The Parmer suit alleged that Dragados dumped approximately 800,000 cubic yards, and Dragados' estimates placed the quantity at approximately 300,000 cubic yards. Dragados hired subcontractors to truck the waste to the site, monitored the site, and maintained records of the truckloads of fill delivered to the site. In short, the evidence conclusively establishes that Dragados intentionally dumped fill at the Coke property in violation of the contractual limits, and nothing in the record would permit a factfinder to determine otherwise. The allegations in the Parmer suit center on the unauthorized placement of fill, and further investigation by Liberty would not have revealed additional facts relevant to the coverage decision.

Dragados suggests that the harm resulting from its intentional act of placing excess fill on the property was unintentional. But this case is distinguishable from cases in which the insured's intentional act led to consequences that may have been unexpected. The harm caused by the placement of excess fill was the *presence of excess fill* on the property. The solution, whether accomplished through a damages award or the settlement that Dragados and Parmer ultimately entered into, was simply to remove that fill. The fact that the property was transferred from Coke to Parmer is irrelevant. The owner of the property was entitled to demand that the excess fill be removed, and indeed Coke issued its cease-and-desist letter prior to the property transfer.

14

Dragados argues that it did not intend to disrupt development of the property, since it did not know such development would be planned. While Dragados may not have known that the property would be purchased by a party with development plans, the alleged development delay arose from the same intentional act and intentional injury—the placement and continued presence of unauthorized fill on the property. Dragados has produced no evidence that its intentional conduct led to some additional "accident" that caused an unintended injury.[4]

Not only is the injury here the intended and expected result of Dragados' intentional placement of the fill on the Coke property, the cost of properly disposing of fill and construction waste is among the costs that should be incorporated in any bid on a highway construction project like the one at issue here. Permitting a contractor to transfer a portion of the basic project costs to an insurer by, as alleged by Parmer, trespassing onto property belonging to a third party and dumping the waste in violation of a contract, then seeking coverage after predictably being sued would result in perverse incentives.

Dragados has not put forth evidence that would permit a factfinder to find that the Parmer suit alleged an "occurrence" within the meaning of the Policy. Neither the Parmer suit nor a reasonable investigation into the underlying facts revealed information that would suggest it involved a potentially covered event requiring Liberty to provide a defense. Therefore, Dragados'

---

4 As the Eastern District of North Carolina explained in a case involving faulty workmanship for installation of defective waterproofing materials, there is no occurrence when the underlying case seeks repair of the faulty workmanship, but there could be an "accident" and therefore an occurrence if, for example, the faulty waterproofing caused leaks that damaged office furniture or "caused the ceiling to collapse thereby causing injury to a person standing inside the new addition." *Wm. C. Vick Const. Co. v. Pennsylvania Nat. Mut. Cas. Ins. Co.*, 52 F. Supp. 2d 569, 585–86 (E.D.N.C. 1999), *aff'd sub nom. Wm. C. Vick Const. Co. v. Great Am. Ins. Co.*, 213 F.3d 634 (4th Cir. 2000). Here, nothing new or unexpected happened to cause an injury beyond that inherent in the placement of the fill—there was no leaching of toxic materials or collapse of unstable material or other event that could be considered an accident.

motion for summary judgment must be denied and Liberty's motion must be granted. Having found that there was no "occurrence," there is no need to address Liberty's argument that the Parmer suit did not allege "property damage" or Dragados' argument regarding indemnity for the Parmer settlement.

## CONCLUSION

Wherefore, after thorough review and careful consideration, the Court **ORDERS** that *Defendant Liberty Insurance Corp.'s Motion for Summary Judgment and Request for Oral Argument* (Document 37) be **GRANTED** as to summary judgment and denied as to hearing and oral argument, that *Plaintiff Dragados USA, Inc.'s Motion for Summary Judgment* (Document 38) be **DENIED**, and that summary judgment be granted in favor of the Defendant.

The Court further **ORDERS** that *Plaintiff Dragados USA, Inc.'s Unopposed Motion to Seal Document* (Document 40), seeking to seal the confidential settlement agreement executed between Dragados and Parmer Edge, LLC, be **GRANTED**, finding that the parties' interest in maintaining the confidentiality of the settlement terms substantially outweighs any public interest in access, particularly as the terms of the settlement are not central to the matter before the Court.

The Court **DIRECTS** the Clerk to send a copy of this Order to counsel of record and to any unrepresented party.

ENTER: April 14, 2025

IRENE C. BERGER
UNITED STATES DISTRICT JUDGE
SOUTHERN DISTRICT OF WEST VIRGINIA

16